Gants, Ralph D., J.
The plaintiff, the Massachusetts Correction Officers Federated Union (known as “MCOFU”), has brought this action seeking to enjoin the disciplinary transfer of Correction Officer Robert Grocki, the Chief Union Steward at MCI-Concord (“Officer Grocki”), to MCI-Cedar Junction for violating the Rules and Regulations Governing All Employees (“Rules Governing Employees”). In short, MCOFU claims that Officer Grocki is being unfairly punished for simply engaging as a union steward in a “robust” conversation with a management representative concerning a job assignment given to a fellow MCOFU member, and that his transfer will have a chilling effect on the willingness of other MCOFU stewards to challenge management actions on behalf of their union membership. Commissioner of Correction Kathleen Dennehy (“Commissioner Dennehy”) contends that Officer Grocki’s conduct crossed the line that separates “robust” discussion from verbal abuse and insubordination, and that “allowing him to return to MCI-Concord would jeopardize the Superintendent’s ability to command at the institution, thereby risking safety and security.” (Commissioner Dennedy affidavit at ¶7.)
On May 6, 2005, this Court held a full evidentiary hearing, at which seven witnesses testified:
1. Robert Tarantino, a Captain at MCI-Concord (“Captain Tarantino”);
2. Stephen Studley, another Captain at MCI-Concord (“Captain Studley”);
3. Peter Pepe, Jr., Superintendent of MCI-Concord (“Superintendent Pepe”);
4. James Bender, Deputy Commissioner of Correction (“Deputy Commissioner Bender”);
5. Jeffrey Bolger, Director of Employee Relations for the Department of Correction (“Director Bolger”);
6. Officer Grocki; and
7. Steven Kenneway, President of MCOFU.
Having considered the evidence at the hearing, as well as the various affidavits submitted and the exhibits admitted into evidence, this Court makes the following findings of fact and conclusions of law.
The Events of January 12, 2005
On January 12, 2005, Captain Tarantino was the primary shift commander for the 3 p.m.-l 1 p.m. shift at MCI-Concord. As a captain, he belonged to a separate captain’s union, which was affiliated with the International Brotherhood of Correction Officers and not part of MCOFU. Consequently, although performing a management function on that evening shift, he was not in labor relations parlance part of the management of the Department of Correction (“DOC”).
At or around 6 p.m. that afternoon, Captain Tarantino spoke with Lieutenant Jaworski about what Captain Tarantino perceived to be problems in the booking and admissions area (“the booking area”), which was under Lieutenant Jaworski’s supervision. In essence, Captain Tarantino told Lieutenant Jaworski that Sergeant Hebert could not control the booking area, that it posed security concerns, and that he wanted Lieutenant Jaworski to spend a majority of his time there to make sure that the policies and procedures were being followed. Lieutenant Jaworski, a MCOFU member, apparently quickly shared this conversation with Sergeant Hebert, who promptly telephoned Officer Grocki, who had become Chief Union Steward only a few weeks earlier. Sergeant Hebert complained to Officer Grocki that Captain Tarantino was trying to micromanage the booking area, and did not respect the way he was running it. Sergeant Hebert then handed the telephone to Lieutenant Jaworski, who explained that he had been ordered by Captain Tarantino to spend the majority of his time in the booking area.
Officer Grocki telephoned Captain Tarantino shortly thereafter, at around 7 p.m., and asked the Captain if he had a moment. When Captain Tarantino said he did, Officer Grocki told him that he had just heard that Captain Tarantino had created a booking lieutenant position and asked him who gave him permission to create a newjob. Captain Tarantino said he did not have time to discuss this now and would speak with Officer Grocki when he (Captain Tarantino) did his “rounds” of the prison.
About a half hour later, before Captain Tarantino had done his “rounds,” Officer Grocki arrived at an office in the administrative building that Captain Tarantino shared with Captain Studley. Captain Studley was in the office with another DOC captain, preparing paperwork. When Captain Tarantino entered the officer shortly thereafter, Officer Grocki asked to speak with him about a private matter and they walked to the small MCOFU office down the hall.[1]
*358 When they entered and closed the door, Captain Tarantino set what he understood to be the ground rules for the discussion and specifically said there had to be mutual respect. Officer Grocki told Captain Tarantino that he had no right to put a lieutenant in the booking area because he was creating a new booking lieutenant position. He said there should be a lieutenant bid for this new position. Captain Tarantino said he did have the right to assign Lieutenant Jaworski to spend time there because he (Captain Tarantino) was the supervisor and the booking area was among Lieutenant Jaworski’s responsibilities. He said if Officer Grocki had a problem with his order, there was a forum to grieve it. Captain Tarantino reminded Officer Grocki that he knew what it was to be a union guy, since he had been a MCOFU member, and knew what it was to fight for the union. Officer Grocki said that he wanted to resolve the issue right here, right now. Captain Tarantino reminded him of what he had said about the need for mutual respect and declared the conversation over. Before he left, Officer Grocki said he had the agreement that Captain Tarantino was violating by his order, and reached into a file cabinet near him to find it. He pulled out a labor-management settlement agreement and handed it to Captain Tarantino. Captain Tarantino reviewed it, and asked Officer Grocki where in that agreement it said that he could not assign a lieutenant as he had done. Officer Grocki read the agreement and realized to his embarrassment that it did not address that issue. Frustrated, he threw the file, saying that Captain Tarantino was “a fucking no good management boy” and that he knew nothing about unions. Captain Tarantino asked him, “Who is acting like a baby now?” and left the room. In the hallway, Officer Grocki responded, “You think this is a fucking joke? I will close this fucking place down. I will close down the fucking trap.”[2] Captain Tarantino asked if that was a threat. Officer Grocki said it was not a threat but a “promise.” He added, “We closed the trap down for three days when [Superintendent] Coalter was here.” As Officer Grocki walked down the hall, he saw that Captain Studley was still in the office where he had earlier been and was within earshot of what Officer Grocki had said in the hallway. Officer Grocki said sarcastically, “Oh, you guys are good,” as if Captain Studley had been placed there to be a witness to Officer Grocki’s outburst. Officer Grocki then returned to his post.
When he returned to his office, Captain Tarantino called Officer Grocki’s immediate supervisor — Lieutenant Golden — and asked her who had relieved Officer Grocki. She said that she had. Captain Tarantino told her that Officer Grocki was upset and ordered her to evaluate whether he was capable of resuming his duties. She said he was okay. He told her that Officer Grocki was not to leave his post.
Captain Tarantino then telephoned Superintendent Pepe at his home, and told him what had occurred. Superintendent Pepe decided not to “detach” Officer Grocki that night (that is, suspend him with pay and order him to leave the prison). While he thought that the incident was serious, he believed it to be over with Officer Grocki having returned to his post, and thought he would address it when he returned to work the next morning.
Shortly later that same evening, Captain Studley saw Officer Grocki speaking with another officer away from his post in the service yard.[3] He asked Officer Grocki whether Lieutenant Golden had relieved him. Officer Grocki initially said she had, then admitted that no one had relieved him. He told Captain Studley “to write that one up, too.”
Captain Studley radioed Lieutenant Golden to see him at his office, wanting to reiterate to her Captain Tarantino’s order that Officer Grocki stay at his post. Officer Grocki overheard the radio transmission and asked Lieutenant Golden if she wanted him there as her union representative; she said she did. She soon arrived at Captain Studley’s office with Officer Grocki, who said he was there as her witness. Captain Studley told them that this was not a union representation situation because no one was being disciplined or being questioned about being disciplined. Captain Studley told Officer Grocki there was no need for him to be there and he could return to his unit. Officer Grocki said he would leave unless Lieutenant Golden wanted him there. She said she did. Captain Studley again told Officer Grocki that he could return to his unit. After Officer Grocki again said that he would leave unless Lieutenant Golden wanted him there, Captain Studley gave him a direct order to return to his post. Lieutenant Golden said she would call him if she needed him, and Officer Grocki agreed to go.
The next day, Superintendent Pepe reviewed the reports that had been prepared by Captains Tarantino and Studley about Officer Grocki’s outburst and his leaving his post. He believed it appropriate to “detach” Officer Grocki pending the outcome of the disciplinary hearing, essentially suspending him with pay and barring him from any DOC facility. Superintendent Pepe conferred with Deputy Commissioner Bender about the detachment and he spoke with Commissioner Dennehy, who ordered it.
The Disciplinary Process
The disciplinary hearing was conducted on February 22, 2005. Captain Studley testified at the hearing, but Captain Tarantino did not, since he was on vacation at the time; his report was admitted into evidence. Officer Grocki testified in his own defense. On March 11, 2005, in a seven-page decision, the hearing officer found “just cause” to discipline Officer Grocki for his conduct on January 12, 2005. The hearing officer specifically found that Officer Grocki violated the following Rules Governing Employees:
Rule 6(a), which states in part, “In your working relationships with coworkers you should treat each *359 other with mutual respect, kindness and civility, as become correctional professionals.”
Rule 6(d), which states in part, “You should readily perform such duty as assigned, and must exhibit at all times the kind of respect toward your superior which is expected and required in correctional service”; and
Rule 13(b), which states in part, “Employees having charge of inmates, or in a security tower, or assigned to any other security position, must not leave their post nor terminate their tour of duty until relieved by proper authority.”
The hearing officer also found that Officer Grocki violated 103 DOC 237.01, “Prevention and Elimination of Workplace Violence.”
The hearing officer recommended that he receive a five-day suspension without pay and be required to attend a psychological fitness for duty examination before returning to work. The hearing officer also recommended, “due to the obvious strain on the working relationship this matter has caused between Mr. Grocki and the captains and the necessity to consider the operational needs of the department pursuant to the Workplace Violence policy,” that he be transferred to another prison facility.
On March 29, 2005, Commissioner Dennehy, after reviewing the hearing officer’s report and the documentation provided, found that Officer Grocki had violated Rules 6(a), 6(d), and 13(b) of the Rules Governing Employees, and accepted the disciplinary recommendations of the hearing officer.[4] Officer Grocki promptly exercised his right to appeal this disciplinary action to both the Civil Service Commission and the Labor Relations Commission. Both of these appeals remain pending and, if past is prologue, will remain pending for at least a year.
The Instant Complaint for Injunctive and Declaratory Relief
On April 13, 2005, MCOFU (not Officer Grocki) filed the instant action in this Court seeking injunctive and declaratory relief as to the disciplinary transfer of Officer Grocki to another prison facility, claiming that this transfer, if permitted, will have a chilling effect on MCOFU’s union stewards, who will fear similar retaliation if they vigorously exercise their protected right to advocate with DOC management on behalf of their members. All parties agree that, if Officer Grocki were to prevail in his appeal with either the Civil Service Commission or the Labor Relations Commission, DOC may be required to revoke its disciplinary transfer and return him to MCI-Concord. All parties also agreed that this Court did not have jurisdiction to decide either of those administrative appeals, but did have jurisdiction to issue a preliminary injunction to stay the disciplinary transfer until the resolution of those appeals if the standard for a preliminary injunction had been met. Consequently, the sole issue before this Court is whether DOC may proceed with the contemplated transfer of Officer Grocki from MCI-Concord to MCI-Cedar Junction while the two administrative actions remain pending.
The Standard for a Preliminary Injunction
In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n.ll. Third, “[i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the parly’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. In an appropriate case, like this, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
This Court believes that the outcome of the three-part balancing test will become clear only when two key questions are answered:
1. Did Officer Grocki cross the line between “robust” union advocacy and abusive, disrespectful conduct towards his superiors in violation of the Rules Governing Employees?
2. If he crossed that line, is his transfer to another facility a reasonable disciplinary action for that misconduct or an unreasonable attempt to chill legitimate union advocacy?
This Court will address each question in turn.
1. Did Officer Grocki cross the line between “robust” union advocacy and abusive, disrespectful conduct towards his superiors in violation of the Rules Governing Employees?
The parties agree that union representatives need to be given a substantial degree of latitude when they discuss union matters with management. These matters are almost always adversarial and, at times, the debate will become heated, voices will become loud, and tempers will flare. The parties also agree that, at times, the Queen’s English may give way to some foul language. The parties agree that, while these discussions may not be pleasant for management and may be inappropriate if the DOC employee were not acting *360 as a union representative on behalf of his members, they do not run afoul of the Rules Governing Employees if they are simply “robust,” and not “abusive.” The parties differ sharply, however, as to where this line between “robust” and “abusive” should be drawn in the context of this case.[5]
This Court finds that it need not determine precisely where that line should be drawn, because Officer Grocki’s conduct on Januaiy 12 was so abusive and disrespectful that it went way beyond any reasonable drawing of that line. There were two elements of Officer Grocki’s conduct that day that plainly crossed that line. First, he called Captain Tarantino “a fucking no good management boy.” Officer Grocki was free to disagree with Captain Tarantino and to call his position senseless, even stupid, but it went well beyond permissible “robust” discussion to call him “a fucking no good management boy.” If the roles were reversed and Captain Tarantino had called Officer Grocki “a fucking no good union boy,” that, too, would run afoul of the Rules Governing Employees. It is not the foul language alone that renders this abusive; calling an adult Captain a “boy” is actually the most abusive and disrespectful part of this offensive phrase.
Second, he threatened illegal union action if Captain Tarantino did not change his decision regarding the assignment of Lieutenant Jaworski to spend a majority of his time in the booking area. There is no dispute that MCOFU is not permitted to “close this fucking place down” or to “close down the fucking trap,” and it crosses the line for Officer Grocki to threaten to do so. It crosses the line even further for him to promise to do so.
Indeed, this Court finds that Officer Grocki himself recognizes that these two statements crossed the line, because he falsely denied that he made them (or said anything remotely like them). This Court found Officer Grocki’s testimony, apart from bits and pieces, to be utterly incredible. According to Officer Grocki, when he and Captain Tarantino entered the MCOFU office, he sat down and told Captain Tarantino that, occasionally, issues arise in an institution, and it was his intention to work with Captain Tarantino to resolve this particular issue. He explained to Captain Tarantino that what he had done was to create a booking lieutenant position without having it properly bid. He asked Captain Tarantino to explain what the problems were in the booking area that caused him to order this assignment. Officer Grocki admitted that he grew frustrated when he could not find the settlement agreement but he denied that he threw any file or used any profanity or called Captain Tarantino anything like a “fucking no good management boy.” Rather, he testified that, when he could not locate the document, he simply left the office and walked away, saying nothing. He specifically denied threatening to close the prison or the trap, and denied saying anything to Captain Studley when he saw him. If this indeed was what happened, the conversation would not even have been fairly characterized as “robust,” Captains Tarantino and Studley would both be lying, and there would have been no reason for Captain Tarantino either to have called Lieutenant Golden to check on whether Officer Grocki had calmed down enough to perform his job or to call Superintendent Pepe to report what had just occurred. The simple fact is that Officer Grocki falsely underplayed what happened because he recognized that he could not justify what he had indeed said during that conversation.
It cannot reasonably chill vigorous union advocacy to find that these two elements of his discussion with Captain Tarantino, especially when considered together, fell well beyond even a generous view of the forbidden line. Union representatives need not fear, from this disciplinary action, that they will be punished for arguing with management, for occasionally using foul language, or even for raising their voices. They simply cannot personally demean the management representative they are speaking with by calling him a “fucking no good management boy” or by threatening to take union action they know to be illegal. This hardly should place a chill on union representatives’ ability to advocate with DOC management on behalf of their union members.
2. Since Officer Grocki crossed the line into abusive behavior, is his transfer to another facility a reasonable disciplinary action for his misconduct or an unreasonable attempt to chill legitimate union advocacy?
Having found that Officer Grocki crossed the line that separates “robust” union advocacy from abusive, disrespectful behavior, and that some disciplinary action is appropriate for his misconduct, this Court must now consider whether his transfer to MCI-Cedar Junction (above and beyond his five-day suspension without pay) is an appropriate disciplinary sanction. While a great deal of deference is due DOC in such matters, this Court also recognizes that a transfer to another facility would not be permissible if it had no reasonable disciplinary purpose but was intended solely to disrupt the union and discourage other union stewards from vigorously advocating on behalf of union membership.
Here, DOC has articulated two distinct justifications for Officer Grocki’s transfer. First, as Commissioner Dennehy declared in her affidavit, “at MCI-Concord, staff regularly disregard the direct orders of their supervising officers.” (Commissioner Dennehy affidavit at ¶7.) This extraordinary statement was echoed in the testimony of Superintendent Pepe and Deputy Commissioner Bender. Superintendent Pepe declared that, at MCI-Concord, there are many correction officers who are not willing to follow even basic orders. Deputy Commissioner Bender said that there is little respect for management at MCI-Concord among a core group of correction officers, and this *361 group influences the others. He added that the correction officers there consider any supervisor in the chain of command to be management, and attempt to undermine their supervision and intimidate them. The gist of their testimony was. that MCI-Concord, in contrast with any other Massachusetts correctional institution, is rife with insubordination and, as Superintendent Pepe put it, Officer Grocki’s transfer is necessary because it sends the message to MCI-Concord correction officers that, if you are insubordinate, there will be consequences. The gist of their testimony was also that, if a court were to enjoin the transfer, it would send the message to the correction officers at MCI-Concord that insubordinate behavior like that committed by Officer Grocki is permissible and protected.
Second, DOC contends that Officer Grocki is less likely to engage in the future in similar volatile, insubordinate conduct if assigned to MCI-Cedar Junction. MCI-Cedar Junction is a much smaller facility than MCI-Concord, housing roughly 600 inmates rather than the roughly 1,100 at MCI-Concord. MCI-Cedar Junction, except for the Departmental Disciplinary Unit, is located in one building, while MCI-Concord is located in many buildings on its Concord campus. MCI-Cedar Junction is a high security facility, while MCI-Concord is medium security, and as a result MCI-Cedar Junction deals with more violent, emergency situations. In part because its prisoners are more dangerous and in part because of the “culture” of that institution, MCI-Cedar Junction has more supervision and greater respect for its chain of command, and orders there are more readily followed. In essence, DOC argues that Officer Grocki is less likely again to get out of line in this prison atmosphere and, if he were again to be insubordinate, MCI-Cedar Junction is better able promptly to get him back in line.
MCOFU contends that the sole purpose of the transfer is to weaken the union by denying MCI-Concord its chief union steward. MCOFU also contends that DOC’s complaint of widespread insubordination at MCI-Concord is simply its way of complaining about a strong union presence in that facility. This Court does not agree with MCOFU’s contentions, and finds that Officer Grocki’s transfer to MCI-Concord was not ordered because he was a union steward and was not intended to chill legitimate union advocacy. There are at least four reasons for this Court’s finding.
First, DOC commonly transfers correction officers to another prison facility as a disciplinary sanction, either alone or in conjunction with a suspension or other punishment. Since late 1999, DOC had made 45 transfers for disciplinary reasons. There is no pattern of such transfers being used to interfere with union activity. Indeed, of the 45 transfers that have occurred because of insubordination, workplace violence, or sexual harassment, this is the first involving a chief union steward.
Second, this Court credits the testimony of Commissioner Dennehy, Deputy Commissioner Bender, and Superintendent Pepe that there is widespread insubordination at MCI-Concord. This is a remarkable statement for these DOC officials to make, and this Court doubts that they make it lightly, especially since it raises questions about their ability to control a prison for which they bear responsibility. Moreover, there was other evidence presented at the evidentiary hearing and in the record to support this conclusion. Only days before the hearing, many copies of a document entitled “Behind the Lies” were found in the roll call room at MCI-Concord. This document, in an apparent pathetic attempt at satire, declared that the only requirement for managers is that they must be ugly, and went on to speculate as to Commissioner Dennehy’s preferences during oral and vaginal sexual intercourse. While this Court credits MCOFU President Kenneway’s denial that the union had anything to do with a document that he properly described as “unacceptable,” the mere fact that a document this childish and stupid would be found in the roll call room (and be “dedicated to Chief Union Steward Bob Grocki”), says something about the respect for authority at MCI-Concord. In addition, Officer Grocki himself testified that correction officers routinely would “post-up,” which upon further inquiiy essentially meant that they left their posts without permission to take a short break for fresh air or conversation. The testimony at the hearing also demonstrated that Officer Grocki, when found away from his post by Captain Studley, initially lied about having received permission to leave his post and then, when caught, told Captain Studley “to write that one up, too,” which hardly reflects any remorse for having disregarded his responsibilities.
Third, this Court also credits DOC’s contention that an order from this Court returning Officer Grocki to MCI-Concord would be perceived as judicial tolerance of insubordination, and would aggravate an already dangerous situation. As declared by Commissioner Dennehy in her affidavit, “Officer Grocki’s return to MCI-Concord would be completely inconsistent with agency principles of safety and security and with the need to obey the rules and regulation governing the Department.”
Fourth, this Court credits DOC’s contention that Officer Grocki would be less likely to be insubordinate in the future at a more disciplined, more closely supervised, higher security environment at MCI-Cedar Junction than if he were allowed to remain at MCI-Concord.
In short, this Court finds that there are legitimate reasons to transfer Officer Grocki as a disciplinary sanction for his misconduct, and that the transfer was not intended to deter other union stewards from zealously defending the rights of union members or otherwise to punish MCOFU.
*362 Irreparable Injuiy and Balancing the Equities
While Officer Grocki would be unlikely to prevail in this Court on his administrative appeals, those appeals will not be heard by this Court but by the Civil Service Commission and the Labor Relations Commission. This Court, therefore, must recognize the possibility that one or both of those Commissions, for whatever reason, may view the merits differently and direct Officer Grocki’s return to MCI-Concord. Given that possibility, this Court must then consider whether MCOFU will suffer irreparable injuiy from Officer Grocki’s transfer to MCI-Cedar Junction for the anticipated year or two before the administrative appeals are adjudicated. This Court finds that MCOFU will not suffer irreparable injuiy for two reasons.
First, MCOFU has not argued that Officer Grocki possesses special skills or talents that would effectively render him irreplaceable during the pendency of those administrative appeals. Officer Grocki had only been the Chief Union Steward at MCI-Concord for roughly three weeks before this incident happened, and there is no reason to believe that another union steward cannot ably replace him in that role. Indeed, in view of the lack of maturiiy and civility that Officer Grocki demonstrated on January 12, 2005, there is reason to believe that another union steward would be equally or more effective than he was in representing union members.
Second, the transfer should have no significant impact on the willingness of his replacement as Chief Union Steward vigorously to defend the rights of union members, because the conduct that Officer Grocki is being punished for was plainly beyond the pale of legitimate “robust” union advocacy. An attorney can effectively argue for his client in court without demeaning his adversary and threatening to close down the courthouse, so holding someone in contempt for such conduct would not chill legitimate courtroom advocacy. So, too, here — nothing about this decision affects the substantial leeway that is given union representatives in their labor discussions with management.
Finally, even if Officer Grocki’s transfer did result in some irreparable injuiy to MCOFU, this Court finds that the grant of a preliminary injunction to prevent the transfer would result in far greater irreparable injuiy to DOC. As stated earlier, this Court credits DOC’s assertion that such an injunction would be understood by correction officers at MCI-Concord to mean that a union steward need not follow the rules of civility and mutual respect that every other correction officer must comply with, and that insubordination is permissible if done in the name of the union. Such a result would mean that MCI-Concord, which already is beset by rampant insubordination, would be even more out of control, and, as Commissioner Dennehy attested, “would jeopardize the Superintendent’s ability to command at the institution, thereby risking safety and security.” (Commissioner Dennehy affidavit at ¶7.)
ORDER
For the reasons stated above, this Court finds that Officer Grocki is unlikely to prevail on the merits in his administrative appeals, that MCOFU will not suffer irreparable injuiy from the disciplinary transfer during the pendency of the administrative appeals, and that the balance of the equities in denying preliminary injunctive relief versus granting such relief strongly favors DOC. As a result, this Court hereby DENIES the plaintiffs motion for a preliminary injunction and, since this is the only relief sought in the complaint, ORDERS that judgment issue in favor of the defendants.

There were no inmates in this area.

The trap is the area at the entrance to the prison where the prison guards must enter to start their shift. To ensure security, the protocol is for a number of arriving guards to enter the first trap door, which closes behind them before the second trap door opens to allow them entrance into the prison. This procedure takes some time, and can be slowed by reducing the number of guards entering at one time and the speed by which they enter. Also, although the union contract provides that the prison guards must arrive for their shift ten minutes early to give them time to enter the trap and get to their posts, the union employees had routinely been coming in earlier so that they would have plenty of time to get through the trap and to their posts for the start of their shift.

Officer Grocki admitted that he had left his post for no permissible reason to speak with Officer Donahue about Captain Tarantino’s assignment of Lieutenant Jaworski to the booking area. He also testified that he “posted up” on a nightly basis. When asked by the Court to define “posting up,” he essentially explained that it meant leaving one’s post without permission for a brief period of time for fresh air or a conversation.

Commissioner Dennehy made no finding as to whether Officer Grocki violated the DOC policy entitled “Prevention and Elimination of Workplace Violence.” The failure to make this finding appears to have been inadvertent, since she notes in her March 29, 2005 letter that he had been charged with this violation. What appears to have happened is that Commissioner Dennehy, in writing the March 29 letter, revised her earlier letter dated January 31, 2005, which set forth the allegations against him. The March 29 letter simply repeated verbatim the sentence in the January 31 letter regarding the allegation of a violation of the Workplace Violence policy, and failed to revise that sentence to reflect her finding regarding this allegation. Inadvertent or not, the consequence is that there is no finding by the Commissioner regarding the allegation of a violation of the Workplace Violence policy, and this Court will not speculate as to what that finding might have been if the error had been spotted.

This Court recognizes that DOC contends that the leeway given to union-management discussions should not apply here, because Captain Tarantino was not part of DOC management and belonged to another union. This Court will grant Officer Grocki the same leeway regarding his discussion with Captain Tarantino because, as shift commander, he was exercising a management function and union representatives are permitted, even encouraged, to resolve labor disputes informally when they arise. On that shift, there was no one from management there, so Officer Grocki was permitted to seek recourse from the highest ranking superior on duty.